Forest **BLACKSTOCK** and Nelson Clabaugh a co-partnership d.b.a. the firm of C. B. Drilling Company, Plaintiffs,

v.

T. J. CULBERTSON and C. T. Vandenover, Defendants.

Civ. 4841.

United States District Court,
D. Minnesota, Fourth Division.

Feb. 7, 1955.

Fred Clausen, Minneapolis, Minn., for plaintiffs.

William C. Kelly and Arthur M. Lystad, Minneapolis, Minn., for defendants.

DEVITT, District Judge.

This action was brought by a Texas oil drilling co-partnership against two Minneapolis residents to recover the costs of drilling an oil well in Jones County, Texas.

A well, identified as Carlson No. 2 was drilled by plaintiffs on land upon which defendant Culbertson held an oil and gas lease. It is admitted that the well was drilled. It is uncontroverted that the cost was $11,163.17. Defendants deny that the well was drilled at their request or for their benefit or by virtue of any agreement with them. The facts are many and controverted. The testimony is in conflict. An understanding of the issue requires a chronological recital of the happenings.

Defendants are co-managers of a Minneapolis restaurant. They, with two others, are the sole stockholders of the corporation, Culbertson's Inc., which operates the place. Both defendants have previously engaged in oil ventures. They are partners in an oil exploration near Chandler, Oklahoma.

In July, 1953, Culbertson went to Abilene, Texas and there purchased in his own name an assignment of an oil and gas lease on the 160-acre Carlson farm near Anson in Jones County. On July 22, 1953 he entered into a written agreement in his name alone with the plaintiffs by the terms of which plaintiffs agreed to drill a well for oil or gas at a place 990 feet from the North line and 330 feet from the East line of the Carlson farm. This well, known as Carlson No. 1, was drilled between July 23 and August 3, 1953 to a depth of 3,325 feet. Although the well produced some oil and in its last drilling stages indicated propensities of a successful venture, it was eventually determined to be of doubtful economic value. Defendant Culbertson paid the agreed price for the drilling of Carlson No. 1.

On July 27, 1953, while Carlson No. 1 was being drilled, Culbertson, along with Bryan Edwards of Lubbock, Texas, purchased a second oil and gas lease from Hugo B. Hatterius, who held the lease on land across the road and east of the Carlson farm. This lease required Culbertson and Edwards to commence drilling operations on or before August 10, 1953.

On or about August 10, 1953, plaintiffs moved their drilling rig and equipment across the road, dug pits and made other preparations precedent to drilling operations. It was then discovered that the drilling rig was at the wrong location, not on the ground leased from Hatterius, but some distance north of the proper location on land owned by a farmer named Cornelius. As a result of this mislocation Culbertson and the plaintiffs each paid ½ of the estimated cost, $1,350, of moving the rig, setting it up, tearing it down, digging the pits and causing incidental surface damage. The evidence does not reflect who was responsible for the mislocation.

Plaintiffs then drilled the controverted Carlson No. 2 on the Carlson lease at a point approximately 660 feet north of Carlson No. 1. Drilling took place, intermittently, between August 15 and August 31, 1953. A depth of 3334 feet was reached. It was a "dry" hole.

Culbertson was present during most of the drilling on Carlson No. 1. He was back in Minnesota, in the North Shore area suffering from hay fever, during drilling on Carlson No. 2.

Co-defendant Vandenover was present during all of the drilling operations except for short-time trips to Dallas, Texas, August 21 to August 25, and to Chandler, Oklahoma, August 26 to August 28.

So much for the non-controverted facts.

Plaintiffs' testimony, through partner Forest Blackstock, was that at the time of the signing of the drilling contract on Carlson No. 1 and at later times Culbertson represented himself as one of several partners, including Vandenover, in the oil venture; that on at least two occasions Vandenover told Blackstock that he was one of the partners; that during the drilling Vandenover held himself out as a partner and gave directions as to the operations and always fully participated in consultations and discussions on an equal basis with Culbertson.

Blackstock testified that on August 11 Vandenover called him by phone and said that he (Vandenover) and Culbertson had agreed to drill No. 2 Carlson in accordance with previous discussions on the subject, and requested that plaintiffs drill No. 2 Carlson well.

Blackstock said that it is customary in the oil fields not to require a written contract for the drilling of wells after the first one, and that he proceeded to drill on the oral request to do so.

Rex McFall, a geologist, substantiated Blackstock's testimony as to Vandenover's apparent status as a partner or at

least as an authorized spokesman for Culbertson. He served as geologist on Carlson No. 1. and No. 2. He said he took orders from both Culbertson and Vandenover.

Plaintiffs' testimony also showed a series of periodic discussions involving Blackstock, McFall, Culbertson and Vandenover looking toward further drilling either across the road on the Hatterius property or further north on the Carlson lease after the completion of Carlson No. 1. McFall said that he specifically recommended the drilling of No. 2 Carlson upon completion of No. 1. All three well locations were adjacent to producing wells. About 50 wells were pumping oil within a three-mile radius of the Carlson farm at the time, although three dry holes had previously been drilled on the Carlson farm some distance west of Carlson No. 1.

Defendant's testimony is contrary. Both defendants denied that they were partners and insisted that neither of them authorized, either directly or indirectly, the drilling of Carlson No. 2. Culbertson said that when Carlson No. 1 was proved unproductive he became "fed up" with the whole thing and went back to Minnesota on August 10 (No. 2 Carlson was started on August 15) and never returned. He said he did not authorize Vandenover to proceed with No. 2 Carlson. He admits that Vandenover stayed on at the Carlson farm during the drilling of No. 2 but only for the purpose of acting for him in making further efforts to make No. 1 well effective as a producer.

Plaintiffs made efforts to collect the drilling bill. They sent their Auditor, Ted C. Doepel, to Minneapolis on February 4, 1954 after repeated efforts to reach Culbertson by phone were unsuccessful. Doepel testified that Culbertson admitted his liability for drilling No. 2 Carlson but said that he had no money to pay it, that he had already mortgaged his home for $10,000 to pay oil venture bills, and that one of his partners in the deal had not paid his agreed contribution. He promised to pay the obligation if he could sell his Minneapolis property and, if not, he would come to Texas and make definite arrangements to pay the bill. Culbertson denies these alleged admissions.

Thus we have a clear-cut fact issue.

After consideration of all the evidence, and the inferences to be drawn therefrom, it is the Court's decision that defendant Culbertson is liable.

Plaintiffs' presentation is more worthy of belief than defendants'. The well was drilled on Culbertson's land. He held a lease on it in his own name. He would profit by the discovery of oil or gas. He, through Vandenover, hired geologist McFall to supervise the geological aspects of the drilling of No. 2 Carlson. He paid McFall for doing so. A copy of McFall's bill for $400, dated September 1, is in evidence. (Plaintiffs' Exhibit 23); excerpts from Culbertson's books (Plaintiffs' Exhibit 20) reflect the obligation. McFall said he was paid by Culbertson on October 8 or 9, 1953 by a draft drawn on the Northwestern National Bank of Hopkins, Minnesota. The payment is not denied.

The record also shows that Culbertson paid other obligations incurred in connection with drilling No. 2 Carlson. On August 29, 1953 he paid the Big State Tool Company of Abilene, Texas, a total of $330; $115 for the rental of a cement truck on August 15 and $215 for the rental of a test tool on August 20—equipment used on No. 2 Carlson. (Plaintiffs' Exhibit 15.)

There was also introduced in evidence, as Plaintiffs' Exhibit 24, a listing, in the handwriting of Vandenover, of the unpaid bills for the drilling of No. 2 Carlson totalling $19,618.17. The first item on the list is "C & B Drilling Co., $11,163.17". This list of unpaid bills was given by Culbertson to auditor Doepel upon his visit to Minneapolis on February 4, 1954.

Thus there are three specific instances of Culbertson's previous recognition of his responsibility for the drilling of Carlson No. 2.

The Court is impressed with the theory that although Culbertson was absent from Texas during the drilling of No. 2 Carlson he left Vandenover on the ground as his agent. Blackstock and McFall recognized Vandenover as an authorized spokesman for the venture. McFall testified that Vandenover made many long distance calls to Minnesota. Culbertson admitted he talked to Vandenover by phone about every other day. McFall quoted Vandenover as making references to talks with Culbertson preceding the reaching of decisions on drilling, the taking of tests and other activities of the venture.

Vandenover was present and participated in the discussions and reached decisions in connection with the taking of drill stem tests and the abandonment of further drilling on No. 2 Carlson well.

 This evidence leads to the logical conclusion that Vandenover was acting as an agent for Culbertson and, as such, ordered the drilling of No. 2 Carlson. The Court so finds. A principal is bound by the acts of his agent when he clothes the agent with apparent authority to act for him. 3 C.J.S., Agency, § 239, et seq.

By Culbertson's own testimony he knew that No. 2 Carlson well was being drilled. He said that Vandenover told him so by long distance telephone call on or about August 27th, when No. 2 Carlson was drilled to a depth of 2,300 feet. Still Culbertson admits he made no effort to stop the drilling (because "they were so close to the finish of the well"); nor did he disavow responsibility for it.

The evidence shows that although Vandenover well knew that Carlson No. 2 was being drilled on Culbertson's lease he admits that he never took any action looking toward a disassociation with the operation. His conduct was to the contrary.

The Court is satisfied from the evidence that Culbertson was responsible for the drilling of Carlson No. 2, and that the plaintiff should recover from him accordingly.

We come now to the question of whether Vandenover was a partner and also liable as such.

The plaintiffs assert that Vandenover said on several occasions that he was a partner and that his actions in directing the drilling activities were as a member of the partnership notwithstanding the fact that the first drilling contract was signed by Culbertson alone and that the Carlson lease was only in Culbertson's name.

McFall testified that it is common practice in the oil fields for partnership ventures to be carried on in the name of only one of the partners.

The plaintiffs also point to evidence which shows that necessary electricity for the drilling operations was purchased from the local cooperative electric company and that this was done in the name of "Culvan" Oil Co., standing for Culbertson and Vandenover.

Vandenover explains the "Culvan" title in terms of the fact that the electric power company required that electricity be sold in the name of a company, not an individual, and that the name was devised for that purpose alone.

Culbertson vigorously denied that Vandenover was a partner or had any interest in the venture. Vandenover made a similar denial. Culbertson did admit that several other persons had an interest in the project. He listed the names of Carlson, LeFors, Edwards, Keller, William Morris and Stanley Morris. It is not clear from the evidence if these persons were actually partners or simply had an "override" for a stated amount. At all events, there is no evidence that Vandenover had a similar interest.

Some support for Vandenover's assertion of non-responsibility as a partner is found in the fact that Culbertson paid for his room, board, and expenses in connection with the venture. Itemizations of these expenditures were received in evidence.

 Viewing the evidence in its entirety, the Court is satisfied that it does

**832**

not preponderate in favor of the conclusion that Vandenover was a partner. The greater weight of the evidence shows that Vandenover was an agent of Culbertson's.

Findings of fact and conclusions may be prepared accordingly.

An exception is allowed.